UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

Thomas Sutliffe and
Epping Residents for
Principled Government, Inc.

     v.                           Civil No. 06-cv-474-JL
                                    Opinion No. 2008 DNH 198

Town of Epping et al.


**O R D E R**

The plaintiffs, Epping Residents for Principled Government, Inc. ("ERPG") and its chairman, Thomas Sutliffe, claim that the Town of Epping violated their rights under the First Amendment by its handling of their request to place a link to ERPG's website on the Town's homepage. The defendants, who include the Town, its Board of selectmen, and current and former members of the Board who have been sued in their official and individual capacities, move for summary judgment. They argue, among other things, that they reasonably handled the plaintiffs' request to link their site to the Town's homepage, a nonpublic forum.

This court, which has jurisdiction over this matter under 28 U.S.C. § 1331 (federal question), heard oral argument on the defendants' motion on November 12, 2008. For the foregoing reasons, the court grants the motion for summary judgment.

I.   **STANDARD OF REVIEW**

Summary judgment is appropriate where the "pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  In making this determination, the "court must scrutinize the record in the light most flattering to the party opposing the motion, indulging all reasonable inferences in that party's favor."  <u>Mulvihill v. Top-Flite Golf Co.</u>, 335 F.3d 15, 19 (1st Cir. 2003).  The following facts are set forth in accordance with that standard.

II.  **BACKGROUND**

The Town began operating its homepage in 1998, offering information about its various boards and committees, including the times of their scheduled meetings.  From time to time, the homepage has contained links to other websites, including those of other government agencies, e.g., the State of New Hampshire, School Administrative Unit 14, and Epping Middle-High School, as well as some civic organizations, e.g., the New Hampshire Municipal Association and the Exeter Area Chamber of Commerce. The record contains no evidence as to how the links to any of these sites came to be placed on, or removed from, the Town's

homepage, though it is undisputed that this could be accomplished only with the approval of the Board of Selectmen.

Beginning in early 2007, the homepage included a link to the website of "Speak Up, Epping!," an event organized to promote civic discourse and involvement in the Town through a "community profile" program.  This program, which has run in a number of other New Hampshire municipalities, was facilitated by the University of New Hampshire Cooperative Extension as part of its research into the characteristics of a "healthy community."  The program entails a day-long discussion among a broad cross-section of the Town's residents, organized around what the Extension has identified as ten qualities that contribute to a healthy community.  This discussion is intended to result in a re-energized community spirit, increased citizen involvement, community-defined projects and action groups, and a complete record of the event.

After learning the details of the community profile program from Extension staff, a small group of Epping citizens formed a steering committee for the "Speak Up, Epping!" event.  At the committee's urging, the Town's Board of Selectmen agreed in August 2006 to pay the Extension a $500 fee to cover the costs of its role in facilitating the event; the Town and the Extension later entered into a memorandum of understanding as to that and

3

other details.  The committee provided reports of its progress to
the Board of Selectmen, including a memorandum in December 2006.
This memorandum explained the purposes of the "Speak Up, Epping!"
event, as set forth above; identified the members of the steering
committee; attached a draft agenda for the event; and noted that
preparation of a budget to guide fundraising was underway.

The memorandum also explained that the committee had begun
work on getting word of "Speak Up, Epping!" out to the community
in a number of ways, including the use of the Town's homepage
"for general outreach," and indicated that the committee's
chairman would contact the Town administrator to that effect.
The administrator subsequently allowed the placement of a link to
the "Speak Up, Epping!" website from the Town's homepage because,
as he later explained, the Board of Selectmen had endorsed it.
In early 2007, the "Speak Up, Epping!" site consisted of an
abbreviated version of the December 2006 memorandum provided to
the Board of Selectmen--in essence, as the co-chair of the
steering committee later testified, "what's going on, when is it
happening, what our objective was . . . sort of the generic stuff
you would put up there to get people to come to something."

The "Speak Up, Epping!" event took place as scheduled on
April 14, 2007, at the Epping Middle-High School.  The
Cooperative Extension's report of the event, which is some fifty-

4

five pages long, reflects a broad range of views on an equally broad range of topics, as expressed by the citizens who took part.  These include the ostensibly competing views that the Town should "control taxes," and that there is "not enough funding" for various municipal programs, both identified as "key issues." But the event involved no advocacy on behalf of any political candidate or, as the steering committee co-chair testified, "for any political issues at all . . . we were very, very strong about not bringing politics into it because we felt that would be a turnoff" to participation.

Following the "Speak Up, Epping!" event, the steering committee once again reported to the Board of Selectmen on, among other things, the amount of money the committee had raised and how that money had been spent.  By August 2007, the "Speak Up, Epping!" website contained a list of the various working groups formed at the event, together with the times and places of their upcoming meetings and an upcoming potluck supper, as well as a link to the report of the event on the Extension's website and a message of appreciation to those who had participated.

Based on the appearance of a link to this version of the "Speak Up, Epping!" website from the Town's homepage, Sutliffe wrote to the Board of Selectmen, requesting that a link to the website of his organization, ERPG, also be placed there.  ERPG

describes itself as "a taxpayers group that has opposed certain expenditures in Epping which the group deems to be excessive and/or wasteful" and, more colorfully, "a perennial thorn in [the Town's] side opposing its profligate spending."  But the summary judgment record contains no evidence as to ERPG's point of view on any particular issue.

In response to Sutliffe's request, the selectmen asked ERPG "to provide a mission statement, list of members, meeting dates, financial statements, and information as to how residents may join" to enable "a side-by-side comparison" between ERPG and "Speak Up, Epping!"  The purpose of this comparison, the selectmen stated, was to ensure "that each group is non-political in nature, and does not endorse any candidates."  In making this decision, one of the selectmen noted that he had visited the ERPG website, which he characterized as "very political" and containing "attacks [on] individuals" and "hateful editorials."[1] This selectman commented that "although he agreed with many of the ideas [on the ERPG site], he thought it was used to address political issues," while the "Speak Up, Epping!" site reflected "a lot of residents who are working together to make Epping a better place and no political information was included."  There

---

[1]  This selectman has not been named as a defendant here.

6

is no other evidence in the record as to the content, at any

time, of the ERPG site, www.EppingNoSpinZone.com.[2]

Sutliffe balked at the Board's request, demanding that it

provide "a copy of the written policy that establishes the

Board's AUTHORITY to ask for the information" and "a copy of the

meeting minutes where the Board of Selectmen requested this same

information from the 'Speak up Epping' [*sic*] group."  After two

months had passed with no response from the Board, Sutliffe and

ERPG moved to amend their complaint in this action to claim that

the Town, the Board, and certain of its members had violated the

plaintiffs' rights under the First Amendment by the defendants'

demand for information in response to the plaintiffs' request to

place the link on the Town's homepage.[3]

The Board of Selectmen subsequently adopted a written

"Website Policy."  This document notes that the Town maintains

_____

[2]  The phrase "No Spin Zone," of course, is generally
associated with Fox News political commentator Bill O'Reilly.

[3]  This action, which had been pending for nearly a year at
that point, also asserted claims by Sutliffe, ERPG, and others
that the Town, the Board of Selectmen, the School Board, and
other local officials had violated the plaintiffs' rights under
the First Amendment and equal protection clause by denying them
access to other fora, viz., taxpayer-funded mailings and similar
communications which local officials used to express their
official views on particular budget items.  The court dismissed
these claims for lack of standing or as barred by res judicata
and collateral estoppel by the outcome of prior proceedings in
the state courts.  Sutliffe v. Epping Sch. Dist., 2008 DNH 076.

its "official website to provide citizens, businesses, and

visitors with information about Town programs, services,

projects, issues, events, public meeting documents and

activities."  The policy states that the website will therefore

> include information only on those events and programs
> that are coordinated and/or sponsored by the Town of
> Epping.  The Town Website will also contain links to
> selected local, state and federal government agencies.

The Town has acknowledged in its discovery responses in this case

that it previously had no written policy regulating the content

of its website.  At some point after the "Speak Up, Epping!"

event, the link to its website was removed from the Town's

homepage at the request of the steering committee's co-chairman.


## III. **ANALYSIS**

"Nothing in the Constitution requires the Government freely

to grant access to all who wish to exercise their right to free

speech on every type of Government property without regard to the

nature of the property or to the disruption that might be caused

by the speaker's activities . . . .  Accordingly, the extent to

which the Government can control access depends on the nature of

the relevant forum."  Cornelius v. NAACP Legal Def. & Educ. Fund,

Inc., 473 U.S. 788, 799-800 (1985).  The defendants argue that

the Town's homepage is a nonpublic forum to which they can

constitutionally restrict access "based on subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral." Id. at 806.  Because, the defendants say, they acted reasonably and viewpoint neutrally in asking ERPG to provide certain information when it asked to access the homepage, they did not violate the plaintiffs' First Amendment rights.[4]  The plaintiffs, however, assert that the defendants' request offends the Constitution in three respects:  (1) it does not survive strict scrutiny, which applies because the website is actually a public forum, (2) because it was put to the plaintiffs, but not "Speak Up, Epping!," it amounts to unconstitutional viewpoint discrimination in any event, and (3) the request itself threatens the plaintiffs' First Amendment right of association.

The plaintiffs raised this third theory in their second amended complaint, citing Gibson v. Florida Legislative Investigation Committee, 372 U.S. 539 (1963), and Bates v. City of Little Rock, 361 U.S. 516 (1960).  As the Supreme Court reaffirmed in those cases, "'compelled disclosure of affiliation

---

[4]  The defendants also argue, in the alternative, that the Town's homepage--including the link to the "Speak Up, Epping!" site--is the Town's "own speech and therefore is exempt from First Amendment scrutiny." Johanns v. Livestock Mktg. Ass'n, 544 U.S. 550, 552 (2005).  For reasons which will appear, the court need not reach this argument.

with groups engaged in advocacy may constitute an effective restraint on freedom of association,'" given that "'[i]nviolability of privacy in group association may in many circumstances be indispensable to preservation of freedom of association, particularly where a group espouses dissident beliefs.'"  Gibson, 372 U.S. at 544 (quoting NAACP v. Alabama ex rel. Patterson, 357 U.S. 449, 462 (1958) (internal bracketing and ellipses omitted)); see also Bates, 361 U.S. at 523.

But the plaintiffs do not even mention this theory in their objection to the defendants' summary judgment motion, so any such claim is waived.  See, e.g., Rocafort v. IBM Corp., 334 F.3d 115, 121 (1st Cir. 2003).  Moreover, to prevail on a claim that compelled disclosure of membership information violates its members' associational rights, an organization must show, "typically, that enforcement of the disclosure requirement will result in harassment of current members, a decline in new members, or other chilling of associational rights."  United States v. Comley, 890 F.2d 539, 544 (1st Cir. 1989).  The record contains no evidence to that effect.  The court now proceeds to consider the plaintiffs' other two theories.

**A.**   **Public or nonpublic forum**

First Amendment law recognizes three types of fora:  the
traditional public forum, the public forum created by government
designation, and the nonpublic forum.[5]  Cornelius, 473 U.S. at
802 (quoting Perry Educ. Ass'n v. Perry Local Educators' Ass'n,
460 U.S. 37, 45 (1983)).  "Traditional public fora are those
places which 'by long tradition or by government fiat have been
devoted to assembly and debate,'" like public streets and parks.
Id. (quoting Perry, 460 U.S. at 45).  As the plaintiffs concede,
the Town's homepage does not fit this category.  See Putnam Pit,
Inc. v. City of Cookeville, 221 F.3d 834, 843 (6th Cir. 2000)
(ruling that, because municipal website did "not allow for open
communication or the free exchange of ideas between members of
the public," it was not a traditional public forum).

Instead, the plaintiffs argue, the Town's homepage amounts
to a designated public forum, i.e., "public property which the
State has opened for use by the public as a place for expressive
activity," triggering strict scrutiny of any restrictions on

---

[5]   Though some courts have drawn a further distinction
between a "limited" and a "non-public" forum, the court of
appeals has indicated that the same standard of scrutiny for
restrictions on speech applies regardless.  Ridley v. Mass. Bay
Transp. Auth., 390 F.3d 65, 76 n. 4 (1st Cir. 2004).  Consistent
with Ridley, the parties make no effort to distinguish the
concepts of "limited" and "non-public" fora, and this court
follows suit.

speech there.  _Perry_, 460 U.S. at 45.  "The Supreme Court has repeatedly held that the government must have an _affirmative intent_ to create a public forum in order for a designated public forum to arise."  _Ridley_, 390 F.3d at 76.  The government's intent depends on its "policy and practice" as to the forum as well as "the nature of the property and its compatibility with expressive activity."  _Cornelius_, 473 U.S. at 802.  The government's "explicit expressions about intent" are also relevant, though not dispositive.  _Ridley_, 390 F.3d at 76.

The defendants have adopted an official "Website Policy" announcing that the Town's homepage exists "to provide citizens, businesses, and visitors with information about Town programs, services, projects, issues, events, public meeting documents and activities" and that, as a result, its content is limited to "those events and programs that are coordinated and/or sponsored by the Town of Epping."  While, as the plaintiffs emphasize, this policy had not been formalized prior to this litigation, it is nevertheless direct evidence that the defendants did not intend to open the homepage as a public forum.  "The past history of characterization of a forum may well be relevant; but that does not mean a present characterization about a forum may be disregarded."  _Ridley_, 390 F.3d at 77.  Indeed, the defendants

maintain that, all along, they used the homepage "to provide information to the citizenry of the Town on Town business."

Of course, such "a statement of intent contradicted by consistent actual policy and practice would not be enough" to preserve the nonpublic nature of a forum. Ridley, 390 F.3d at 77. But the defendants' policy and practice of hyperlinking other sites to the Town homepage strongly supports their position that they did not intend to turn it into a public forum. Links could be placed there only with the approval of the Board of Selectmen; so far as the record reveals, this approval was granted in only a handful of cases in a nearly ten-year period. See Perry, 460 U.S. at 37 (finding no public forum where access was never "granted as a matter of course to all who seek to distribute material," but had to be sought on an ad hoc basis).

Moreover, it appears to have been granted only to Town agencies or civic organizations, consistent with the stated purpose of the homepage.[6]  "[T]he government does not create a designated public forum when it does no more than reserve eligibility for access to the forum to a particular class of speakers, whose members must then, as individuals, 'obtain

---

[6]  At oral argument, the plaintiffs were not able to come up with any example of a link that was placed on the website in contravention of this policy, other than, they argued, the "Speak Up, Epping!" link.

permission' to use it."  <u>Ark. Educ. Tel. Comm'n v. Forbes</u>, 523
U.S. 666, 679 (1998) (quoting <u>Cornelius</u>, 460 U.S. at 679).

The plaintiffs suggest that the defendants deviated from the
stated purposes of the homepage when they allowed a link to the
website of "Speak Up, Epping!," which they characterize as an
"outside private group[] whose views the Town favors."  Putting
aside the principle that "[o]ne or more instances of erratic
enforcement of a policy does not itself defeat the government's
intent not to create a public forum," <u>Ridley</u>, 390 F.3d at 78, the
plaintiffs' characterization of "Speak Up, Epping!" is off the
mark.  "Speak Up, Epping!" was neither "outside" nor "private"
nor, for that matter, even a "group."  It was an event, conducted
as part of a statewide program of the state university, paid for
in part by public funds, held on public property, and, so far as
the record indicates, open to participation by any Epping
citizen.  This event was intended to foment a re-energized
community spirit, increased citizen involvement, and community-
defined projects and action groups in the Town.  These generic
civic-minded objectives fit comfortably within the announced
purposes of the Town homepage.  <u>See</u> <u>Perry</u>, 460 U.S. at 47 (ruling
that a school district had not transformed its internal mail
system into a designated public forum by allowing a labor union
representing the district's teachers, plus "some outside

14

organizations such as the YMCA, Cub Scouts, and other civic and church organizations to use the facilities").

Two different courts of appeals, in fact, have ruled that government websites did not become designated public fora even though non-governmental organizations were permitted to post links to their own websites there on an ad hoc basis.  See Page v. Lexington County Sch. Dist. One, 531 F.3d 275, 285 (4th Cir. 2008); Putnam Pit, 221 F.3d at 844.  The court in each case emphasized the fact that third parties could not simply place links to their websites on the government's in the fashion of an Internet message board, but needed specific authorization to do so from the government, which always retained full control over the content of its own site.  Page, 531 F.3d at 284; Putnam Pit, 221 F.3d at 844.  The courts also pointed out that, other than the links to these other websites, the government homepage contained no information supplied by, and enabled no communication among, third parties using it.  Page, 531 F.3d at 284; Putnam Pit, 221 F.3d at 844.  The same is true here.[7]

---

[7] The plaintiffs argue that the outcome in Page relied solely on the determination that the website in question amounted to government speech--a question the court here does not reach, see note 4, supra.  But the court in Page went further, specifically ruling that the government there "did not create a limited public forum by including links to other websites."  531 F.3d at 285.  And, even if Page could be read as limited to the government speech doctrine, it does not follow that some of the

Page and Putnam Pit are convincing applications of the general principle that "[s]elective access, unsupported by evidence of a purposeful designation for public use, does not create a public forum." Cornelius, 473 U.S. at 805. They also demonstrate that, even though the Internet as a whole or certain kinds of websites individually are highly compatible with expressive activity, the same cannot be said of a municipal homepage that exists chiefly as a resource for information about the municipality, Putnam Pit, 221 F.3d at 844, as opposed to "a type of 'chat room' or 'bulletin board' in which private viewers could express opinions or post information," Page, 531 F.3d at 284. Even where "there is nothing inherent in the property which precludes its use for some expressive activity," that does not rule out that "particular expressive activity may be inconsistent with the nature of the property." Ridley, 390 F.3d at 77. This court agrees with the Fourth and Sixth Circuits that, while municipal homepages often serve as avenues for the government to communicate information about the municipality, they do not, at

---

facts the court considered in applying the doctrine there, i.e., the government's purpose in maintaining the homepage and its ultimate control over its content, do not also suggest that the homepage was not a public forum. See Ariz. Life Coal. v. Stanton, 515 F.3d 956, 965 (9th Cir.) (endorsing "who controlled the speech" and "the purpose of the program" as factors in government speech inquiry), cert. denied, 77 U.S.L.W. 3197 (2008).

16

least in that format, naturally lend themselves to a forum for public discussion.  So neither the defendants' "policy and practice" nor "the nature of the property and its compatibility with expressive activity" suggests their intent to create a public forum in the homepage.

Rather than addressing this established test for a designated public forum, the plaintiffs argue that the homepage is one because "[c]ourts will infer governmental intent to create a public forum if the government permits some voices to be heard yet excludes others, without having established clear standards for inclusion and exclusion designed to prevent interference with the forum's designated purpose."  As is clear by now, the inference is actually to the contrary--permitting "some voices to be heard" but not others is in fact one of the hallmarks of a nonpublic forum, i.e., selective access.  Forbes, 523 U.S. at 679-80; Cornelius, 473 U.S. at 804-05; Perry, 460 U.S. at 49.

The plaintiffs' lone authority for their view is the dissenting opinion in Ridley, which stated that "[c]ourts will hold 'that the government did not create a public forum only when its standards for inclusion and exclusion are clear and are designed to prevent interference with the forum's designated

purpose.'"[8]  390 F.3d at 105 (Torruella, J., dissenting) (quoting

United Food & Commercial Workers Union, Local 1099 v. Sw. Ohio

Reg'l Transit Auth., 163 F.3d 341, 351 (6th Cir. 1998)).[9]  But

the source of this quotation, the Sixth Circuit's decision in

United Food, does not actually cite any cases that deemed a forum

nonpublic due to the absence of "clear standards" for exclusion.

Indeed, United Food itself relies solely on a Third Circuit

decision that recognizes, simply, "the fact that the government

has reserved the right to control speech without any particular

standards or goals, and without reference to the purpose of the

forum, does not necessarily mean that it has not created a public

forum."  Christ's Bride Ministries, Inc. v. Se. Pa. Transp.

Auth., 148 F.3d 242, 251 (3d Cir. 1998).  But it does not follow

---

[8]  At oral argument, the plaintiffs also relied on Aids
Action Comm. of Mass., Inc. v. Mass. Bay Transp. Auth., 42 F.3d 1
(1st Cir. 1994), in support of this view.  As the court of
appeals explained in Ridley, however, it declined to reach the
public forum question in AIDS Action, so that case "does not
assist plaintiffs on the claim that [defendants] ha[ve] created a
public forum."  390 F.3d at 80.

[9]  At oral argument, the plaintiffs described this statement
as emanating from the "concurring part" of Judge Torruella's
opinion in Ridley.  But the statement at issue in fact comes from
Judge Torruella's dissent from the majority's ruling that the
MBTA had not created a public forum.  390 F.3d at 97.  His only
concurrence was with the majority's ruling that the MBTA had
engaged in viewpoint discrimination.  Id. at 96.  Since, as Judge
Torruella pointed out, this ruling obviated any need for forum
analysis, id., he would not, in the course of concurring with
that ruling, have discussed the test for a nonpublic forum.

from this proposition that the absence of standards means that

the government <u>has</u> created a public forum, as the court there

explicitly acknowledged.[10]  <u>See</u> <u>id.</u>

     This is true not only as a matter of logic, but experience.

A government would generally have no reason to go about drawing

up "clear standards" of access to a forum unless intending to

open the forum to the public.  But under the plaintiffs' proposed

rule, such inaction, while wholly justified, transforms

government property into a public forum the moment some non-

_____

     [10]  As the court in <u>United Food</u> observed, "[w]hen the
government merely reserves the right to exclude a speaker '<u>for</u>
<u>any reason at all</u>' or 'without reference to the purpose of the
forum,' the potential for government censorship is at its
greatest."  163 F.3d at 352 (quoting <u>Christ's Bride Ministries</u>,
148 F.3d at 251).  This concern, while valid, is appropriately
taken into account by guarding against viewpoint discrimination
in a nonpublic forum, rather than by enlarging the definition of
a nonpublic forum in the way the defendants suggest.  Relatedly,
some Justices and commentators have criticized what they see as
the circular nature of the Supreme Court's nonpublic forum
analysis, arguing that it "make[s] nearly all restrictions on
speech self-justifying, since the very fact that the government
had denied the plaintiff access could be invoked to prove that
the government never intended to create a public forum" and was
therefore free to deny the plaintiff access.  Laurence H. Tribe,
<u>American Constitutional Law</u> § 12-24, at 996 (2d ed. 1988)
(footnote omitted); <u>see also</u> <u>Cornelius</u>, 473 U.S. at 825
(Blackmun, J., joined by Brennan, J., dissenting).  While this
criticism has some force, the Supreme Court has adhered to the
same formulation of the nonpublic forum test regardless, <u>see</u>
<u>Davenport v. Wash. Educ. Ass'n</u>, 127 S. Ct. 2372, 2381 (2007), and
needless to say this court must do the same.

governmental speaker is allowed to use it.[11]  That is not the
law.  "The government does not create a public forum by inaction
or by permitting limited discourse, but only by intentionally
opening a nontraditional forum for public discourse."  <u>Cornelius</u>,
473 U.S. at 802.  Indeed, the Court ruled in <u>Perry</u> that the
schools had not rendered their internal mail system a public
forum by granting access to outside groups, even though this was
done through ad hoc decisions by the school principals, rather
than upon any written or articulated policy.  460 U.S. at 48-49.

The lack of such a policy when the plaintiffs sought access
to the Town homepage, then, does not mean, or even imply, that it
was a public forum at that point.  Moreover, while the defendants
concededly had no written or articulated policy, the undisputed
facts show that they were not controlling access based on whim or
caprice, but on consistent case-by-case judgments as to whether a

_____

[11]  For example, a town would have no reason to devote its
resources to developing "clear standards" for the kind of speech
allowed in the men's room in the town hall.  Under the
plaintiffs' proposed test, however, the men's room becomes a
public forum once the town allows a single speaker to engage in
speech there, e.g., a public health group is permitted to hang a
poster extolling the benefits of hand-washing.  And this occurs,
moreover, regardless of either the town's past policy and
practice of restricting speech in the forum (it could have
previously refused one hundred requests to hang political
placards there) or, even more significantly, the nature of the
forum and its compatibility with expressive activity.  The
plaintiffs' proposed test is plainly at odds with both Supreme
Court precedent and common sense.

particular link would serve the mission of the homepage as source
of information about Town business.  This practice was nothing
like "the incoherent written policies and the occasional,
subjective exercise of control" supporting the dissent's argument
for a public forum in Ridley.  390 F.3d at 108.  Under the
Supreme Court's established test for a designated public forum,
as just discussed, the homepage was nonpublic.


**B.**   **Reasonabless of the restriction and viewpoint discrimination**

The plaintiffs' remaining arguments depend almost entirely
on their claim that they were required to supply information
about themselves before the selectmen would consider hyperlinking
ERPG's site to the Town homepage, while "Speak Up, Epping!" was
not.  To start with, the court notes that this allegedly
differential treatment is not in and of itself the constitutional
affront the plaintiffs perceive.  The Supreme Court has
repeatedly held that "[c]ontrol over access to a nonpublic forum
can be based on subject matter and speaker identity."  Cornelius,
473 U.S. at 806; see also Davenport, 127 S. Ct. at 2381; Good
News Club v. Milford Cent. Sch., 533 U.S. 98, 106-07 (2001);
Forbes, 523 U.S. at 682; Rosenberger v. Rector & Visitors of
Univ. of Va., 515 U.S. 819, 829 (1995); Lamb's Chapel v. Ctr.
Moriches Union Free Sch. Dist., 508 U.S. 384, 392-93 (1993);

21

<u>Perry</u>, 460 U.S. at 49; <u>Greer v. Spock</u>, 424 U.S. 828, 838 (1976);

<u>Lehman v. City of Shaker Heights</u>, 418 U.S. 298, 303-04 (1974).

In other words, the First Amendment does not prevent restricting speakers from a nonpublic forum based on who they are or what they want to talk about.  <u>See</u> <u>Perry</u>, 460 U.S. at 49 ("Implicit in the concept of the nonpublic forum is the right to make distinctions in access on the basis of subject matter and speaker identity.").  The only constitutional limit on such exclusions, again, is that they "must not be based on the speaker's viewpoint and must otherwise be reasonable in light of the purpose of the property." <u>Forbes</u>, 523 U.S. at 682.  The restriction at issue here broke neither of these rules.

First, the restriction was reasonable in light of the purpose of the forum, which the defendants describe, again, as "to provide information to the citizenry of the Town on Town business."  When a municipality operates such a website, it has "legitimate interests in keeping links that are consistent with the purpose of the site--providing information about city services, attractions, and officials," as well as "allowing a relatively limited number of links to its site, so as to avoid a cacophony of speakers which might drown out the city's information." <u>Putnam Pit</u>, 221 F.3d at 845.  And knowing the mission, membership, and finances of a group wishing to hyperlink

22

its site to a municipal homepage reasonably serves these legitimate interests, by providing at least a rough guide as to the likely content of the group's own website and, therefore, its compatibility with that of the Town's.

The existence of "substantial alternative channels that remain open" to the plaintiffs besides the Town homepage further supports the reasonableness of the defendants' actions. Perry, 460 U.S. at 53. After all, the plaintiffs maintain their own website--they do not need to place their content on the Town's in order to make it accessible via the Internet--and can presumably place its link on other websites, disseminate it by e-mail, and the like. "The reasonableness standard is not a particularly high hurdle," Ridley, 390 F.3d at 90 (citing Cornelius, 473 U.S. at 808), and the defendants' actions readily clear it.

The plaintiffs do not question the legitimacy of restricting the Town homepage to Town business, nor the reasonableness of enforcing that restriction by requesting information from groups wishing to link their sites to the Town's. Instead, relying on the comments of certain selectmen in deciding to put that request to ERPG, the plaintiffs argue that the operative restriction on the content of the Town homepage is a ban on political speech; because the ban is not limited to "explicit words of advocacy of

23

election or defeat of a candidate," the plaintiffs continue, it is unconstitutional under <u>Buckley v. Valeo</u>, 424 U.S. 1 (1976).

As the Supreme Court has since explained, however, "<u>Buckley</u> makes clear that the express advocacy limitation . . . was the product of statutory interpretation" intended to avoid potential vagueness and overbreadth problems in the restriction at issue there, "rather than a constitutional command." <u>McConnell v. FEC</u>, 540 U.S. 93, 191 (2003).  Because <u>Buckley</u> "nowhere suggested that a statute that was neither vague nor overbroad would be required to toe the same constitutional line," <u>id.</u>, the Court in <u>McConnell</u> refused to recognize "an inviolable First Amendment right to engage in" political speech falling short of express advocacy, <u>id.</u> at 190.  The defendants, then, did not transgress <u>Buckley</u> by scrutinizing the plaintiffs' site for political content, as opposed to merely express advocacy.[12]

---

[12]   The plaintiffs have not properly challenged the Town's website policy on vagueness or overbreadth grounds but, in any event, that challenge would be unsuccessful.  In <u>Ridley</u>, the court of appeals expressed serious doubt about whether these doctrines even applied to restrictions on speech in a nonpublic forum "where there are no consequences for submitting [speech for publication in the forum] and having it rejected" and therefore no potential chilling effect.  390 F.3d at 94.  The court concluded that, in such a context, the vagueness doctrine imposes no additional hurdle on government restrictions of speech:  they must simply be "'reasonable in light of the characteristic nature and function' of that forum."  <u>Id.</u> at 95 (quoting <u>Griffin v. Sec'y of Veterans Affairs</u>, 288 F.3d 1309, 1323 (Fed. Cir. 2002)).

Furthermore, a ban on hyperlinks to political sites from the Town homepage reasonably serves legitimate government purposes. The Supreme Court has recognized that "avoiding the appearance of political favoritism is a valid justification for limiting speech in a nonpublic forum." Cornelius, 473 U.S. at 809.  So the defendants could have legitimately worried that linking the plaintiffs' site to the Town homepage would have been construed as an endorsement of their views to the exclusion of competing ones.  There is nothing in the record to dispute the suspicion of certain selectmen that the plaintiffs' website was, in fact, "used for political issues."  Political discussions have a place, of course, but the Town could have reasonably concluded that the place was not the same website used to announce board meetings and provide similar news about Town government.

This leads to the plaintiffs' viewpoint discrimination claim.  They charge that, rather than attempting to ensure that the Town homepage remained non-political or restricted to information on Town business, the defendants requested information from the plaintiffs "to silence ERPG's views, constituting unconstitutional viewpoint discrimination."  But the argument for this charge is not well-developed.  It relies principally on the notion that the government may not restrict speech on the basis of content, which, again, is not so in a

nonpublic forum, <u>see</u>, <u>e.g.</u>, <u>Perry</u>, 460 U.S. at 49, as the
plaintiffs acknowledged at oral argument.

The plaintiffs' viewpoint discrimination argument also
relies on the allegedly more favorable treatment of "Speak Up,
Epping!," the site for which, the plaintiffs allege, the
defendants hyperlinked to the Town homepage "without any
preconditions and without reviewing any financial statements" of
the kind demanded of the defendants.  It is true that, in the
government's control of a nonpublic forum, "underinclusiveness
raises a suspicion that the stated neutral ground for action is
meant to shield an impermissible motive," <u>Ridley</u>, 390 F.3d at 87,
but, in this case, there is no dispute that the defendants knew
essentially the same information about "Speak Up, Epping!" when
the link to its site was placed on the homepage as they later
requested of ERPG.

Before explaining that conclusion, however, the court pauses
to note, again, that the plaintiffs' theory seriously
misapprehends the nature of "Speak Up, Epping!"  As discussed in
Part III.A, <u>supra</u>, "Speak Up, Epping!" was not an existing
organization that sought access to the Town homepage as a forum
for disseminating its views.  It was a forum unto itself; all the
Town's citizens were invited to share their thoughts.  Indeed,
despite their charge that the defendants "favored" the "views" of

26

"Speak Up, Epping!" over those of ERPG, the plaintiffs have not even attempted to characterize--let alone provided any evidence of--the differences between these viewpoints, and were not able to articulate them at oral argument.  This is understandable, since the "viewpoints" embraced by the "Speak Up, Epping!" event were the thoughts of everyone who attended.  As one might expect, and as the record bears out, these views were diverse, to the point of including what appears to be ERPG's raison d'etre: lower taxes.  A viewpoint discrimination claim based entirely on alleged favoritism toward speech that aligned with the plaintiffs' would seem to carry the seeds of its own destruction.

Moreover, the "Speak Up, Epping!" event was endorsed by the Board of Selectmen from the outset, when they voted to pay the UNH Cooperative Extension's fee and enter into a contract with that agency so that the Town could participate in the community profile program.  This conferred an "official" status on the "Speak Up, Epping!" event which, as the Supreme Court has recognized, alone serves to justify preferential access to a nonpublic government forum.  See Perry, 460 U.S. at 49 (overruling decision that a government had engaged in viewpoint discrimination by allowing the designated teacher's union, but not its rival, to access a nonpublic forum, reasoning that "it is more accurate to characterize the access policy as based on the

status of the respective unions rather than their views"). That "the Town neither developed the 'Speak Up, Epping!' message nor controlled its content,"[13] as the plaintiffs allege, does not serve to diminish the event's official status: <u>Perry</u> rejected the lower court's refusal "to consider [the union's] access justified as official business because the School District did not 'endorse' the content of its communications," reasoning that "[t]he lack of an . . . endorsement does not mean that the [union's] communications do not pertain to the 'official business' of the [school district]." 460 U.S. at 51 n.10.

In any event, the plaintiffs' claim of differential treatment fails even on its own merits. In December 2006, before the "Speak Up, Epping!" link had appeared on the homepage, the Board of Selectmen had received a detailed memorandum from the event's steering committee, identifying themselves, explaining the purposes of the event, and outlining how the committee intended to proceed with organizing it. This information enabled the selectmen to determine, as they did, that placing the link would effect the purpose of the website "to provide information to the citizenry of the Town on Town business." It also enabled

---

[13] Again, the plaintiffs have never been able to identify what that "message" was.

them to determine whether the "Speak Up, Epping!" event was political in nature.  The plaintiffs emphasize that the Board did not receive detailed information about the event's finances until after it had taken place, but this overlooks the fact that, in the initial memorandum, the steering committee informed the Board that preparation of a budget had just gotten underway and that fundraising had yet to begin.  So it is hard to imagine what any "financial statements" produced at that juncture would have showed, other than blank lines and columns of zeros.

Accordingly, there is no genuine issue of material fact that the defendants asked ERPG for the same information, including as to finances, that they had about the "Speak Up, Epping!" event prior to hyperlinking its site to the Town homepage.  There is therefore no evidence to support the plaintiffs' theory that they were discriminated against in their access to the homepage on the basis of their point of view.  Cf. Ridley, 390 F.3d at 87-88 (finding that MBTA engaged in viewpoint discrimination against would-be advertisers where its "rejection of the[] advertisements does not reasonably serve its purported justification," in addition to "direct evidence, through statements by MBTA officials, that the reason for rejecting the advertisements was actually distaste for [the plaintiff's] viewpoint"); Putnam Pit, 221 F.3d at 846 (remanding for consideration of viewpoint

29

discrimination claim where officials who refused plaintiff access to municipal website had criticized his behavior and opinions).

The plaintiffs essentially conceded at oral argument that they had no such evidence, apart from their contention that the link to the "Speak Up, Epping!" site was allowed because it was "benign" while the link to their site was scrutinized because it was "political." But again, content discrimination in a nonpublic forum does not violate the First Amendment––a point which the plaintiffs also conceded, subject to their view, which the court has already rejected, that the Town homepage was a public forum due to the lack of "clear standards" for exclusion.

It is certainly not impossible that a self-described "thorn in the side" of municipal government like ERPG runs the risk of discrimination on the basis of its views. Indeed, "[s]uspicion that viewpoint discrimination is afoot is at its zenith when the speech restricted is speech critical of the government, because there is a strong risk that the government will act to censor ideas that oppose its own." Ridley, 390 F.3d at 86. Yet standing alone, without evidentiary support, suspicion cannot serve as the basis for a lawsuit. In the absence of any evidence

30

or even a coherent theory of viewpoint discrimination, the defendants are entitled to summary judgment.[14]

IV.  **CONCLUSION**

For the foregoing reasons, the defendants' motion for summary judgment (document no. 68) on the plaintiffs' claims arising out of access to the Town homepage is GRANTED.  Because, following the court's ruling on the defendants' motion to dismiss (document no. 62), these were the only remaining claims, the clerk shall enter judgment accordingly and close the case.

**SO ORDERED.**

_____
Joseph N. Laplante
United States District Judge

Dated:  November 13, 2008

cc:  Charles G. Douglas, III, Esq.
     Benjamin T. King, Esq.
     Daniel J. Mullen, Esq.

--------

[14]  The plaintiffs' complaint--but not their objection to the summary judgment motion--makes reference to an equal protection claim.  As discussed supra, the plaintiffs have thereby waived this claim, but, in any event, it fails for the same reasons their First Amendment claim fails.  See Pagan v. Calderon, 448 F.3d 16, 36 (1st Cir. 2006).